

FILED & ENTERED

MAR 19 2015

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY xxx          DEPUTY CLERK

<u>OPINION NOT FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>JE HYEON LEE,<br><br>               Debtor. | Case No. 2:13-bk-10413 RK<br><br>Chapter 7<br><br>Adv. No. 2:13-ap-01420 RK |
| MI JIN SHIM,<br><br>               Plaintiff,<br><br>  vs.<br><br>JE HYEON LEE,<br><br>               Defendant. | FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW FOLLOWING<br>TRIAL AND ORDER THEREON |

     The above-captioned adversary proceeding was tried before the undersigned United States Bankruptcy Judge on May 22, 2014 and on September 17, 2014.  Frank E. Marchetti, of the Law Office of Frank E. Marchetti, and Chanho C. Joo, of the Law Offices of Chanho C. Joo, appeared for Plaintiff Mi Jin Shim ("Shim" or "Plaintiff").  Andrew E. Smyth, of the Smyth Law Office, appeared for Defendant Je Hyeon Lee ("Lee" or "Defendant").

     Having considered the testimony of the witnesses at trial and the evidence admitted at trial, the court makes the following findings of fact and conclusions of law in this adversary proceeding pursuant to Rule 7052 of the Federal Rules of Bankruptcy

Procedure.  Any finding of fact that should be properly characterized as a conclusion of law should be considered as such, and any conclusion of law that should be properly characterized as a finding of fact should be considered as such.

**FINDINGS OF FACT**

1.  Shim worked for Lee as an employee at his shipping business called 24 Quick from May 2007 to May 2011, and she worked primarily at the Garden Grove office of the business in Orange County.  *Trial Testimony of Mi Jin Shim ("Shim Trial Testimony")*, May 22, 2014 at 9:31 – 9:34 a.m.[1]; *Transcript of Deposition of Je Hyeon Lee ("Lee Deposition"),* September 18, 2013 at 95:13 - 98:7[2].  Lee hired Shim first as a clerk and then promoted her to be the manager of the Garden Grove office.  *Id.*  The business helped customers ship goods to Korea through a shipper called USAS.  *Lee Deposition,* September 18, 2013 at 58:9-18, September 27, 2013 at 152:16 - 153:1.

2.  In September 2010, Lee, who was Shim's boss and supervisor and had worked primarily at a different office in Los Angeles, began primarily working out of the same office in Garden Grove as Shim.  *Shim Trial Testimony*, May 22, 2014 at 9:34 – 9:37 a.m.

3.  In late September or early October 2010, Lee asked Shim to go with him out of the office for lunch and for business errands, which she did, and during some of these trips outside the office, Lee proposed that that they go to a Korean-style spa together, and Lee told Shim that he liked her.  One time, Lee put his hand on Shim's hand while they were in his vehicle, but she told him not to do that and withdrew her hand and turned her body away from him because she did not want a personal relationship with him.  *Trial Declaration of Mi Jin Shim ("Shim Trial*

---

[1]  Citations to the trial testimony of witnesses are to the date and time of the testimony reflected on the court's audio recording of the trial proceedings made using the FTR Gold audio recording program.  Copies of the audio recording files are available from the Clerk of Court.

[2]  Citations to the transcript of the deposition of Je Hyeon Lee are to page number and line number.  The transcript of Lee's deposition was received into evidence at trial as his direct testimony.

*Declaration"*), ECF 41 at 2, ¶ 4; *Shim Trial Testimony*, May 22, 2014 at 9:37 – 9:38 a.m., 9:48 – 9:50 a.m. and 10:17 – 10:22 a.m.; *Trial Testimony of Je Hyeon Lee ("Lee Trial Testimony")*, May 22, 2014 at 1:59 – 2:02 p.m. and 2:21 – 2:22 p.m.; *Lee Deposition,* September 18, 2013 at 94:8-20, 99:13 - 100:25, 104:2 - 112:18, 121:23 - 122:19.

4.  During Shim's employment at 24 Quick, Lee frequently told Shim that he liked her and wanted to date her, telling her that he wanted to be in a close relationship with her.  *Shim Trial Testimony,* May 22, 2014 at 9:37 – 9:38 a.m. and 11:01 – 11:03 a.m.; *Lee Deposition*, September 18, 2013 at 87:9 - 89:12 and 99:13-21, 104:2 - 110:11; *Lee Trial Testimony,* May 22, 2014 at 2:49 – 2:50 p.m.  However, Shim told Lee she did not like him.  *Lee Trial Testimony*, May 22, 2014 at 2:09 – 2:10 p.m.  Shim also told Lee she only wanted a business relationship with him and not a personal relationship.  *Lee Trial Testimony*, May 22, 2014 at 2:50 – 2:52 p.m.

5.  Lee repeatedly asked to touch Shim and did touch her hand, face, shoulder, and hair.  On at least one occasion he tried to hug her from behind.  Shim responded to his efforts to touch her by telling him she did not like it and asking him to stop.  When Lee told Shim that he could not stop himself, she asked him to limit where he touched her (i.e., shoulders or above).  *Shim Trial Declaration* at 3, ¶ 8; *Shim Trial Testimony*, May 22, 2014 at 10:12–10:14 a.m.; *Lee Trial Testimony,* May 22, 2014 at 2:19 - 2:20 p.m. and 2:49 – 2:54 p.m.; *Lee Deposition*, September 18, 2013 at 109:8 -117:5, 116:25 - 117:5, 121:23-122:2.  Lee admitted during his testimony at trial that Shim did not appear to enjoy this.  *Lee Trial Testimony*, May 22, 2014 at 2:17 – 2:19 p.m.

6.  On at least one occasion, Shim was seated at work, and Lee prevented her from standing up.  When Shim tried to leave, Lee grabbed her wrist tightly, which bruised it.   According to Shim, the stress that Shim was feeling at work due to Lee's advances caused her to develop an allergy around her eyes, gave her indigestion and made her feel bad. Lee would harass Shim for long periods of

time, continually asking Shim to go out with him. Shim refused and told Lee that she would quit, and Lee apologized, but continued to harass Shim. *Shim Trial Declaration* at 4, ¶ 12; *Lee Deposition,* September 18, 2013 at 116:4-24.

7.  During the time Shim was employed by Lee her husband was either not working or working only part time and Shim was the only means of support for her family. *Shim Trial Testimony*, May 22, 2014 at 10:15 a.m.  Shim testified that her limited English language ability would also make it difficult for her to find other work, and the court finds that she is probably right. *Id.* at 10:14 a.m.; *see also, id.* at 9:37 – 9:42 a.m.

8.  When Lee came to the Garden Grove location, sometimes he wore shorts to work. On several occasions in November 2010 when Lee was wearing shorts, he sat at his desk in the back room next to Shim's desk with his legs propped up so that he exposed his genitals to her, and Shim was shocked, not knowing what to say or to do, when he exposed himself to her.  The first time this happened, she was shocked, first disbelieving what she saw and then looking down to avoid looking at Lee.  Lee asked Shim why she was not looking at him, and she responded by asking how could she do that, and he replied by asking her why he could not wear shorts.  On another occasion also in November 2010, Shim came into the back room not expecting anyone there, but Lee was there in shorts with his legs propped up with a hat covering himself.  On this occasion, she screamed when he exposed himself after removing his hat from his legs.  Lee later admitted to Shim that he had intentionally exposed himself to her because he wanted to be more intimate with her. *Shim Trial Declaration* at 2-3, ¶¶ 5-7; *Shim Trial Testimony*, May 22, 2014 at 9:51 - 10:00 a.m.

9.  In January 2011, Lee told Shim that he had a sexually explicit dream about himself and Shim.  Lee also told Shim that he wanted her to get a divorce and that he wished that he could tell her husband everything for this to happen.  In response, Shim told Lee that she did not have any feelings for him and that he was just her

4

boss. Lee then told her that they were beyond an employer-employee relationship because Shim saw Lee's private parts when he exposed himself to her. *Shim Trial Declaration* at 3, ¶ 9; *Lee Deposition,* September 18, 2013 at 117:11 – 118.13, 119:12-15.

10. Shim still had lunch with Lee at work after he invited her to the Korean spa and tried to hold her hand and after he exposed himself to her. *Shim Trial Testimony,* May 22, 2014 at 10:26 – 10:29 a.m. and 11:23 – 11:28 a.m.  Shim wanted to quit her job due to Lee's advances, but she could not afford to lose the income from her job and felt that she had to stay. *Shim Trial Testimony*, May 22, 2014 at 10:13 – 10:15 a.m. and 11:25 – 11:27 a.m.   Shim testified that she was the main source of support for her family, which included her parents who recently arrived from Korea, her new baby and her husband who had reduced work hours. *Shim Trial Testimony,* May 22, 2014 at 11:25 – 11:27 a.m.  Lee was aware of Shim's need to work, acknowledging in his deposition testimony that Shim often complained that she was short on money and he knew that she needed the income she received at 24 Quick. *Lee Deposition*, September 18, 2013 at 101:10 - 102:19.

11. Lee eventually hired a part-time employee to work at the office because Shim threatened to quit if he did not do so.  When that employee was not in the office, Lee would touch Shim more and hold her hand. *Shim Trial Declaration* at 4, ¶ 11.

12. Lee insisted that Shim join him on trips out of the office, which he said were work related.  When she later refused to go, he threatened to fire her co-worker whom Shim knew needed the income, so Shim acquiesced and went with him on trips out of the office.  However, during these trips, they did not work and he wanted to only drive around with her or go get foot massages with her.  On at least one trip, when Shim refused Lee he became upset and said he could take advantage of the fact that Shim needed a paycheck. *Shim Trial Declaration* at 4-5, ¶¶ 16-17; *Lee Deposition,* September 18. 2013 at 99:13 – 109:3.  On one occasion, Shim, Lee, and a coworker went to the Morongo Casino Resort and went shopping at the

nearby outlets.  *Lee Deposition,* September 18, 2013, at 88:6 – 92:25; *Lee Trial Testimony* at 2:55 – 2:57 p.m.

13. Shim quit her job with Lee at 24 Quick on May 13, 2011 because his sexual advances took an emotional toll on her, particularly in the last six months before she quit that he kept asking her every day why couldn't they have a personal relationship.  *Shim Trial Declaration* at 5, ¶¶18- 21; *Shim Trial Testimony*, May 22, 2014 at 10:55 – 11:03 a.m.

14. Shim had worked for Lee at 24 Quick on a full time basis (40 hours per week) at a final rate of pay of $12 an hour.  *Shim Trial Declaration* at 5-6, ¶¶ 23-24; *Lee Deposition,* September 18, 2013 at 10:16 – 13:17 and *Exhibit 2 attached thereto; Shim Trial Testimony*, May 22, 2014 at 10:15 – 10:16 a.m.

15. In August 2011, Shim found new full time employment earning only $8 an hour.  *Shim Trial Testimony*, May 22, 2014, 11:03 – 11:04 a.m.  Shim testified that she was not able to find replacement work until that time and that the work she found did not pay as much.  *Id.*

16. The court rejects Lee's arguments regarding Shim's credibility that she testified in her deposition that she knew all the underlying facts supporting her cause of action, but later admitted that she did not actually know such facts because it relies on evidence not in the record in that there is no showing that the transcript of her deposition was received into evidence at trial.  *See Defendant's Response to Plaintiff's Final Points and Authorities*, ECF 50 at 5:24-28 (no citation to admitted evidence of Shim's deposition testimony).

17. Based on the above cited evidence, the court does not find that the social relationship between Lee and Shim was consensual.

18. The court also finds that the evidence does not support Lee's claimed defenses to defeat Shim's showing by a preponderance of the evidence of her claims for sexual harassment and wrongful discharge that she was planning to steal his client list and other proprietary information to set up a competing business, that

6

this justified him to fire her from her employment with him and that she is only

claiming sexual harassment after he found out about her intent to steal his

business.  While Shim admitted that she had thoughts of starting an export

business similar to Lee's and had not discussed her claims of sexual harassment

with others before her discharge from employment by Lee, there is insufficient

evidence that she ever attempted to start a competing business, that she stole or

misappropriated any of Lee's client lists or other proprietary information or that the

complained of sexual harassment of Shim by Lee did not occur.  *See Defendant's*

*Trial Brief,* ECF 40 at 2-3, 5; *Lee Deposition,* September 18, 2013 at 17:5-14,

37:12-13, 71:4-24; *Shim Trial Testimony,* May 22, 2014 at 11:25 to 11:28 a.m.

Such defenses are not supported by the evidence in this case generally as

described herein.

## CONCLUSIONS OF LAW

### Jurisdiction

1. Proceedings to determine the dischargeability of a particular debt are core
   pursuant to 28 U.S.C. § 157(b)(2)(I).

2. Proceedings to determine claims against the bankruptcy estate are core pursuant
   to 28 U.S.C. § 157(b)(2)(B).

3. In this adversary proceeding, Plaintiff's complaint is styled as one to determine the
   dischargeability of a debt under 11 U.S.C. § 523(a), but the underlying debt, or
   claim, that she is asserting in this case has not yet been liquidated.  *See Amended*
   *Complaint,* ECF 5, filed on April 29, 2013.  Ordinarily, the bankruptcy court cannot
   liquidate an unliquidated personal injury tort claim for the purpose of distribution in
   a bankruptcy case, and such a claim must be tried by the federal district court.  28
   U.S.C. § 157(b)(2)(B) and (O) and (b)(5); 1 March, Ahart and Shapiro, *California*
   *Practice Guide: Bankruptcy,* ¶¶ 1:526 - 1:527.1 at 1-65 to 1-66 (2014).

4. Because 28 U.S.C. § 157(b)(5) is not jurisdictional, a party may effectively consent
   to the bankruptcy court adjudicating a personal injury tort claim by failing to raise

an objection in that court and thus waive the restriction on bankruptcy court adjudication under § 157(b)(5).  *Stern v. Marshall*, 131 S.Ct. 2594, 2606-2608 (2011), *cited in,* 1 March, Ahart and Shapiro, *California Practice Guide: Bankruptcy*, ¶¶ 1:527 - 1:527.1 at 1-66.

5. The court determines that the parties have effectively consented to it adjudicating the matter of the liquidation of Plaintiff's claim or debt as part of the debt dischargeability action, waiving any restriction under 28 U.S.C. § 157(b)(5), because the case was fully tried before it and neither party raised any objection to this court adjudicating the matter.  *Id.; see also, In re Sasson,* 424 F.3d 864, 866-875 (9th Cir. 2005) (holding bankruptcy court has subject matter jurisdiction to enter a money judgment in adversary proceedings determining debt dischargeability) (citations omitted); *see also, In re Smith*, 389 B.R. 902, 913-915 (Bankr. D. Nev. 2008) (discussing 28 U.S.C. § 157(b)(5) and *Sasson* and holding that "a conclusion that 28 U.S.C. § 157(b)(5) is jurisdictional would effectively destroy the bankruptcy court's ability to estimate or otherwise treat personal injury claims" and that "*Sasson* thus stands for the proposition that this court has the power to determine [defendant's] liability to [plaintiff] as well as the amount of any damages [for personal injury tort claims].")

### Sexual Harassment

6. The California Fair Employment Housing Act in California Government Code § 12940(j)(1) makes it an unlawful employment practice "for an employer. . . because of sex. . . to harass an employee. . . ."

7. "The elements [of a prima facie claim of hostile-environment sexual harassment] are: (1) plaintiff belongs to a protected group; (2) plaintiff was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the harassment complained of was sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment; and (5)

respondeat superior." *Fisher v. San Pedro Peninsula Hospital*, 214 Cal. App. 3d 590, 608 (1989) (citations and footnote omitted).

8. "Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances." *Fisher v. San Pedro Peninsula Hospital*, 214 Cal. App. 3d at 609. "The factors that can be considered in evaluating the totality of the circumstances are: (1) the nature of the unwelcome sexual acts or works (generally, physical touching is more offensive than unwelcome verbal abuse); (2) the frequency of the offensive encounters; (3) the total number of days over which all of the offensive conduct occurs; and (4) the context in which the sexually harassing conduct occurred." *Id.; see also, Lyle v. Warner,* 38 Cal. 4th 264, 282-295 (2006)(sporadic acts of harassment are not sufficient to establish a claim of hostile work environment).

9. Shim testified at trial that during the nine months that they worked together in the Garden Grove office of Lee's business, Lee as her employer made sexual advances to her as his employee, which was mostly in the form of unwanted verbal advances through asking her to go on dates and to have a boyfriend/girlfriend relationship constantly, but there was some unwanted physical touching of her by Lee, though confined to face, hair and shoulders, that these offensive sexual advances were frequent, that there was at least two incidents of indecent exposure when Lee exposed his genitals to her, that this offensive conduct occurred over a period of nine months and that this offensive conduct occurred when Shim and Lee were alone together during her employment with Lee.  The court finds that this testimony was credible, that the totality of the circumstances weigh in favor of a finding that Lee's acts of harassment of Shim during her employment were sufficiently pervasive and severe to create a hostile or offensive work environment despite his claims to the contrary and that Shim has demonstrated by a preponderance of the evidence that Lee unlawfully harassed

9

Shim in violation of California Government Code § 12940(j)(1). *See Defendant's Trial Brief,* ECF 40 at 4-5.  Specifically, the court finds that Shim has proven by a preponderance of the evidence that she (1) is a member of a protected class (i.e., female gender); (2) was subjected to unwelcome sexual advances, constituting sexual harassment by Lee; (3) the harassment was based on Shim's sex; (4) the harassment was sufficiently pervasive so as to alter the conditions of employment and create a hostile or offensive work environment, and (5) respondeat superior is inapplicable because Lee was the employer and owner of the business which employee Shim.  Shim's trial testimony, which is credible, indicates that that the harassment was sufficiently pervasive to constitute a hostile work environment during the nine-month time period they worked in the same office in Garden Grove between September 2010 and May 2011 because he kept asking her to go on dates (i.e., to go to the Korean-style sauna/spa or foot massage parlors together without their respective families and to go on trips out of town with him alone) and to have a personal and/or sexual relationship, which she did not want, he kept wanting to touch her body, and he did with her relenting only because he was her boss and he agreed to physical limits (i.e., shoulders and above) and he knew and understood that she did not like being touched by him, and he exposed himself to her on several occasions.

10. Lee argues that his social relationship with Shim was consensual because she did not say "no" to their "social excursions" (i.e., meals together, foot massages and an outlet shopping trip).   *See Defendant's Trial Brief* at 2, 5; *see also, Defendant's Response to Plaintiff's Final Points and Authorities*, ECF 50 at 2:13-3:20.  Lee's belief that his social relationship with Shim was consensual was only a figment of his imagination.  As Lee acknowledges, Shim put strict limits on where they could go together or he could touch her.  Shim acquiesced in going out to lunch with Lee during work hours since he was her boss, but there is no indication that she accepted his invitations for dinner.  Lee asked Shim to go with him to the Korean

spa, but there is no indication that she agreed to do that.  Shim did go with Lee on a shopping and casino trip to the Morongo Casino Resort, but she made sure that a female coworker went along, so she and Lee would not be together alone.  Lee testified that Shim accepted his gift purchases during this trip, but this does not indicate any consensual relationship as he remained her boss and she would have had difficulty as his subordinate to refuse his gifts.  Lee asked Shim to go on a trip with him to Las Vegas, but there is no indication that she agreed to accept his invitation.

11. The court rejects Lee's argument that a lack of Shim's complaints of sexual harassment until she was fired, such as emails, texts, or testimony from a friend or co-worker corroborating Shim's claims of sexual harassment proves that the harassment did not occur or that Lee's advances did not upset Shim at the time.  *See Defendant's Response to Plaintiff's Final Points and Authorities*, ECF 50 at 2:5-13, *citing Shim Trial Testimony,* May 22, 2014 at 11:28 a.m.  While the lack of contemporaneous complaints may support an inference that the harassment did not occur, the court determines that Shim's testimony describing Lee's behavior was credible and adequately supports the inference that she as a victim of sexual harassment in a vulnerable situation – being employed in a small business office and needing her job to support her family – and therefore felt compelled to suffer in silence.

12. The court rejects Lee's argument that Shim was "leading" him on.  *See Defendant's Response to Plaintiff's Final Points and Authorities*, ECF 50 at 3:7-21.  Shim may have brought up her marriage in her conversations with Lee, but discussing personal relationships at work should not be viewed as an invitation to sexual advances.  Also, contrary to Defendant's arguments, Shim's agreement that Lee could "touch her hair and face" was not a sign that Shim "had a lot of power in this relationship" as he argues, but was a sign that Shim felt trapped by her need for the job with Lee and was forced to resort to coping strategies such as

allowing him to touch her hair and face in order to prevent him from touching her elsewhere.

13. The court rejects Lee's arguments that Shim was not emphatic enough in her refusal of his sexual advances.  *See Defendant's Response to Plaintiff's Final Points and Authorities,* ECF 50 at 3:21-4:22.  Lee argues that "if Ms. Shim had never agreed to outings, if she had not said 'let's not go where my friends may see me' but instead said 'I do not want to go on a social outing with you,' Mr. [Lee] would have understood 'no' in fact meant 'no' here."  As discussed above, Shim's bargaining with Lee should not be viewed as consent, but as a sign that she felt trapped by the situation and was forced to cope as best she could, and given the situation, a firm "no" should not be required to convince Lee that his advances were unwanted.  Moreover, based on Lee's behavior towards Shim described herein, the court is not convinced that even a firm "no" would have dissuaded Lee.

14. Thus, the court rejects Lee's argument that the social relationship he had with Shim was consensual because it finds Shim's testimony that the relationship was not consensual to be credible, i.e., the bizarre manifestations of their social interactions (i.e., Lee's multiple indecent exposures to Shim, Lee's physical touching of Shim, which he knew was unwanted, and Shim's refusal of his social invitations generally and setting limits on their relationship to keep her job), and the unequal economic relationship between the parties as employer-employee poses a particular difficulty for Lee to show that this was a consensual relationship. The fact that Shim still went to lunch with Lee at work after he invited her to the Korean spa and exposed himself to her does not mean that the social relationship was consensual.  This is evidenced by Shim's credible testimony that she continued to go to lunch with Lee because he was the boss and she needed the job to support her family.   The evidence indicates that the "social" relationship was one-sided, initiated and controlled by Lee.  In this regard, the court finds Shim's

testimony of harassment to be more credible than Lee's testimony of the absence
of harassment.

### Constructive Discharge in Violation of Public Policy

15. "In order to establish a constructive discharge, an employee must plead and
prove, by the usual preponderance of the evidence standard, that the employer
either intentionally created or knowingly permitted working conditions that were so
intolerable or aggravated at the time of the employee's resignation that a
reasonable employer would realize that a reasonable person in the employee's
position would be compelled to resign." *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th
1238, 1251 (1994).

16. "Constructive discharge occurs when the employer's conduct effectively forces an
employee to resign. Although the employee may say, 'I quit,' the employment
relationship is actually severed involuntarily by the employer's acts, against the
employee's will. As a result, a constructive discharge is legally regarded as a
firing rather than a resignation." *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th at
1244–1245 (citation omitted).

17. "Whether conditions were so intolerable as to justify a reasonable employee's
decision to resign is normally a question of fact." *Valdez v. City of Los Angeles*,
231 Cal. App. 3d 1043, 1056 (1991) (citation omitted).

18. Based on the factual findings recited above, the court finds that Shim has proven
by a preponderance of the evidence that Lee's sexual harassment of her was
intolerable and justified her decision to resign.

19. Sexual harassment can form the basis for a cause of action for wrongful discharge
in violation of public policy. *Rojo v. Kliger*, 52 Cal. 3d 65, 91 (1990).

20. The court determines that based on the legal authorities cited above, Lee's sexual
harassment of Shim and Shim's subsequent resignation amounted to a
constructive and wrongful discharge in violation of public policy under California
law.

21. Although Shim did testify that she was considering starting an export business similar to Lee's, the court rejects Lee's defense that he discharged Shim from her employment with him for cause on grounds that she was attempting to steal his client list and other proprietary information to start a competing business because the preponderance of the evidence does not support such a defense (i.e., there was no showing that she actually took his proprietary information or started a competing business), and the court finds more credible Shim's testimony that she quit because the Lee's sexual harassment became intolerable for her.  *See Defendant's Response to Plaintiff's Final Points and Authorities,* ECF 50 at 5:3-9; *Shim Trial Declaration* at 5, ¶ 21; *Shim Trial Testimony*, May 22, 2014 at 11:01 – 11:03 a.m. and 11:31 -11:32 a.m.

**Damages**

22. "Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages."  California Civil Code § 3281.

23. "The general rule is that the measure of recovery by a wrongfully discharged employee is the amount of salary agreed upon for the period of service, less the amount which the employer affirmatively proves the employee has earned or with reasonable effort might have earned from other employment."  *Parker v. Twentieth Century-Fox Film Corp.*, 3 Cal. 3d 176, 181-182 (1970) (citations omitted).

24. "The general rule of damages in tort is that the injured party may recover for all detriment caused whether it could have been anticipated or not. In accordance with the general rule, it is settled in this state that mental suffering constitutes an aggravation of damages when it naturally ensues from the act complained of, and in this connection mental suffering includes nervousness, grief, anxiety, worry, shock, humiliation and indignity as well as physical pain."  *Crisci v. Security Insurance Co. of New Haven, Connecticut*, 66 Cal. 2d 425, 433 (1967), *citing inter alia,* California Civil Code § 3333; *see also, Capelouto v. Kaiser Foundation*

*Hospitals,* 7 Cal. 3d 889, 892-893 (1972) (the detriment [from pain and suffering] is a genuine one that requires compensation, and the issue generally must be resolved by 'impartial conscience and judgment of jurors [or a judge] who may be expected to act reasonably, intelligently and in harmony with the evidence.'") (citations omitted).

25. Based on the factual findings recited above, the court determines that Shim has shown by a preponderance of the evidence that a reasonable person would be disturbed by Lee's conduct towards Shim and would endure mental suffering as a result, as Shim credibly described in her trial testimony, including anxiety, worry, shock, humiliation and indignity.

26. Based on the factual findings recited above, the court determines that Shim has proven by a preponderance of the evidence that her economic damages from Lee's sexual harassment and wrongful discharge are compensable within the meaning of California Civil Code § 3281 are as follows:

   (a) Lost wages from unemployment for three months after wrongful discharge: 12 weeks x 40 hours/week x $12/hour = $5,760.00

   (b) Lost wages from diminished earning capacity for two years after wrongful discharge: 104 weeks x 40 hours/week x $4/hour = $16,640.00.

The economic damages are based on Shim's inability to find replacement work from the time of wrongful discharge in May 2011 to the time she found and started a new job in August 2011 and on the differential in pay between her prior job and her new job after the wrongful discharge for two years (104 weeks). Computing Shim's economic damages for constructive discharge based on a time period of 104 weeks (or two years) as she requested is reasonable because Shim could have reasonably expected to have continued her job for this time period in light of her prior employment with Lee at 24 Quick for approximately four years from May 2007 through May 2011, and the evidence of her job search and new employment shortly after the constructive discharge shows that she made reasonable efforts to

15

mitigate damages. *Parker v. Twentieth Century-Fox Corp.,* 3 Cal. 3d at 181-182 (citations omitted).

27. In determining damages for mental distress, the court finds instructive the discussion of that topic by the Supreme Court of California in *Capelouto v. Kaiser Foundation Hospitals*: "'If a cause of action is otherwise established, it is settled that damages may be given for mental suffering naturally ensuing from the acts complained of.' In general, courts have not attempted to draw distinctions between the elements of 'pain' on the one hand, and 'suffering' on the other; rather, the unitary concept of 'pain and suffering' has served as a convenient label under which a plaintiff may recover not only for physical pain but for fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal. Admittedly these terms refer to subjective states, representing a detriment which can be translated into monetary loss only with great difficulty. But the detriment, nevertheless, is a genuine one that requires compensation and the issue generally must be resolved by the 'impartial conscience and judgment of jurors who may be expected to act reasonably, intelligently and in harmony with the evidence.' Indeed, mental suffering frequently constitutes the principal element of tort damages; awards which fail to compensate for pain and suffering have been held inadequate as a matter of law." *Capelouto v. Kaiser Foundation Hospitals*, 7 Cal. 3d at 892-893 (citations and footnote omitted).

28. Here, the court finds that Shim likely suffered many of the subjective states described in *Capeluoto*. The court considers the nervousness and anxiety that Shim experienced as she went to work each day for Lee at 24 Quick, the shock she felt when Lee exposed himself or described his lewd fantasies, and the indignity she suffered as she was reduced to bargaining with Lee about where on her body he could touch her.

29. Based on the factual findings recited above, the court determines that Shim has proven by a preponderance of the evidence that her non-economic damages are compensable within the meaning of California Civil Code § 3281 as follows:

   Past Mental Suffering/Distress/Anxiety: $50,000.00.

In calculating this amount, the court finds credible Shim's testimony that Lee's actions during her employment caused her mental suffering, distress and anxiety in the past.  Lee does not dispute that his behavior caused Shim to suffer distress. *See Defendant's Response to Plaintiff's Final Points and Authorities,* ECF 50 at 5:17-18 ("Ms. Shim testified that Mr. Lee's behavior caused her distress at times. Defendant is not contesting that.").  However, Lee argues that that Shim is not entitled to damages for the emotional distress that he caused her because there is insufficient evidence in the record support such an award.  *Id.* at 5:18-23 ("However, there is not enough evidence in the record for this Court to correctly assess the length or severity of that distress.  No expert testimony was offered. Although Ms. Shim made a good impression as a nice person, there is no guarantee that her descriptions of emotional distress were not exaggerated because she is in an active litigation.  How is this Court to determine if one money award, or another one 10 times larger, is the proper compensation for any distress she suffered?").  In this regard, the court finds that the discussion of awarding compensatory damages for such harm in *Duarte v. Zachariah,* 22 Cal. App. 4th 1652 (1994) is instructive: "Compensatory damages may be awarded for bodily harm without proof of pecuniary loss.  The fact that there is no market price calculus available to measure the amount of appropriate compensation does not render such a tortious injury noncompensable.  'For harm to body, feelings or reputation, compensatory damages reasonably proportioned to the intensity and duration of the harm can be awarded without proof of amount other than evidence of the nature of the harm.  There is no direct correspondence between money and harm to the body, feelings or reputation.  There is no market price for a scar or for

17

loss of hearing since the damages are not measured by the amount for which one would be willing to suffer the harm.  The discretion of the judge or jury determines the amount of the recovery, the only standard being such an amount a reasonable person would estimate as fair compensation.'"  22 Cal. App. 4th at 1664-1665, *citing inter alia, Restatement (Second) of Torts,* §§ 905 and 912.  Guided by these principles, the court as the trier of fact in this proceeding determines that Shim is entitled to recover the amount of $50,000 as fair compensation for the emotional toll, or mental suffering, she endured caused by Lee from his acts of sexual harassment and wrongful discharge.

30. However, the court determines that Shim has not proven her claims for compensatory damages for past and future mental suffering, distress and anxiety beyond what the court awards here because such claims have not been proven by a preponderance of the evidence.  As the court stated in *Bellman v. San Francisco High School District,* 11 Cal. 2d 576 (1938), "[t]o entitle a plaintiff to recover present damages for apprehended future consequences, there must be evidence to show a degree of probability of their occurring as amounts to a reasonable certainty that they will result from the original injury."  11 Cal. 2d at 588 (citation omitted).  Based on this evidentiary record, particularly in the absence of expert medical testimony regarding Shim's mental health to substantiate her claims for future mental suffering, the court is unable to find that she proved such claims under this standard.

31. In this regard, Shim understood that Lee had emotional problems as she acknowledged in her trial declaration.  *Shim Trial Declaration* at 3-5, ¶¶ 8-20.  For example, Shim stated in paragraph 8 of her declaration: "In December of 2010, Mr. Lee told me that he had a mental disease which makes him lose control of his emotion.  His disease got worse and worse.  He said he wants to go to Korea in order to seek treatment for this mental disease/condition.  He hugged me from behind, held my hand and touched my cheek.  He would also constantly stare at

18

me and would stand beside me while I worked.  This happened almost every day.  From then on I said I wouldn't work outside with him and that I didn't want to go out for lunch with him."  *Id.* at 3, ¶ 8.  Whatever the cause of Lee's antisocial behavior towards Shim and his delusional thoughts about their social relationship, his behavior took an emotional toll on her, causing her mental suffering.  For the most part, Lee abided by the behavioral limits set by Shim, who was able to minimize to some extent his offensive conduct.  However, this does not mean that the emotional abuse and harassment Shim suffered was consensual in any way.  Shim needed her job to support her family and tolerated Lee's unwanted advances until the situation became unbearable.  The harassment was more in the nature of constant pestering from Lee arising out of his emotional problems wanting a personal and/or sexual relationship with Shim that she had to endure in order to keep her job, which she needed to support her family.  Based on the evidence before the court, the harassment was real and appreciable, though it ended when Shim left her employment with Lee.  Thus, in the court's view, Shim is entitled to an award of damages for the mental suffering she endured during her employment with Lee.

## Nondischargeability of Debt

32. 11 U.S.C. § 523(a)(6) provides, "(a) A discharge under ... this title does not discharge an individual debtor from any debt.... (6) for willful and malicious injury by the debtor to another entity or to the property of another entity."  "Willful" and "malicious" are both required elements to establish non-dischargeability under 11 U.S.C. § 523(a)(6). *Ormsby v. First American Title Co. of Nevada (Matter of Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010).

33. For purposes of 11 U.S.C. § 523(a)(6), "willful" means "deliberate" or "intentional." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 and n. 3  (9th Cir.1998).

34. The "willful injury" requirement is met when the creditor shows that: the debtor had a *subjective motive* to inflict the injury; *or* the debtor believed the injury was

*substantially certain* to occur as a result of his or her conduct.  *Petralia v. Jercich (In re Jercich),* 238 F.3d 1202, 1208 (9th Cir. 2001); *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1144 (9th Cir. 2002).

35. A "malicious injury" under 11 U.S.C. § 523(a)(6) involves a wrongful act, done intentionally, that necessarily causes injury that is committed without just cause or excuse.  *In re Jercich*, 238 F.3d at 1209; *Thiara v. Spycher Brothers (In re Thiara),* 285 B.R. 420, 433 (9th Cir. BAP 2002).

36. Debts based on claims for sexual harassment and discrimination have been determined to be non-dischargeable based on a showing of injury that is both willful and malicious under 11 U.S.C. § 523(a)(6).  *See, e.g., Jones v. Svreck (In re Jones)*, 300 B.R. 133, 139-141 (1st Cir. BAP 2003); *Basile v. Spagnola (In re Spagnola)*, 473 B.R. 518, 522-525 (S.D.N.Y. 2012); *McDonough v. Smith (In re Smith)*, 270 B.R. 544, 549-550 (Bankr. D. Mass. 2001); *Thompson v. Kelly (In re Kelly)*, 238 B.R. 156, 160-162 (Bankr. E.D. Mo. 1999).

37. Based on the factual findings recited above, the court determines that Shim's actions shown to constitute sexual harassment were willful because he knew that his verbal and physical acts of harassment of his employee, Shim, were unwelcome and harmful as: (1) Lee constantly asked Shim to go on trips out of the office for nonwork purposes and badgered her to have a "boyfriend/girlfriend" relationship, knowing she was not interested in anything other than a professional relationship with him (e.g. *Shim Trial Testimony*, May 22, 2014 at 11:02 a.m. (describing the six months leading up to Shim's quitting, where Lee would ask Shim the same questions everyday about why they could "not have a relationship like that [boyfriend/girlfriend]")); (2) Lee physically touched Shim's face, hands and shoulders, knowing that she did not want him to touch her and that she did not enjoy his touching of her, and knowing that his touching of her and his advances upon her were unwanted; (3) Lee coerced Shim into going outside with him by threatening to fire her co-workers, which evidences his subjective knowledge that

20

his advances were unwelcome (*Shim Trial Declaration*, ECF 41 at 4 ¶ 16); and (4) he purposely exposed his private parts to her on several occasions, and these circumstances indicate that Lee was aware of the injury these acts were causing her in physical and mental distress and/or substantially certain that such injury would occur.

38. The court rejects Lee's arguments that 11 U.S.C. §523(a)(6) does not apply because he had strong affection for Shim and did not intend to cause her distress. *Defendant's Response to Plaintiff's Final Points and Authorities,* ECF 50 at 4:24-26 ("Mr. Lee had a strong affection if not love for Ms. Shim.  It is unlikely that his goal was to cause her distress.").  In support of this argument, Lee argues, "To obtain a judgment under 11 USC 523(a)(6) the Plaintiff is required to prove the mental elements of 'willful and malicious(ness)' . . . . A 'willful and malicious injury' under Section 523(a)(6) means the Debtor intended 'the consequences of an act,' not simply 'the act itself'. " *Id.* at 4:24 – 5:2, *citing inter alia, In re Howell,* 373 B.R. 1, 3 (Bankr. W.D. Ky. 2007).  The case cited by Lee, *Howell,* in turn quotes *Kawaauhau v. Geiger*, 523 U.S. at 61-62, which stated: "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead 'willful acts that cause injury.'  Or, Congress might have selected an additional word or words, i.e., 'reckless' or 'negligent,' to modify 'injury.'  Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts.  Intentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'" *In re Howell,* 373 B.R. at 4, *quoting, Kawaauhau v. Geiger,* 523 U.S. at 61-62. The court's findings stated above regarding Lee's willfulness is consistent with the holding in *Kawaauhau* and the Ninth Circuit precedent following it in *Jercich* and

*Su*.  Lee's actual knowledge which is the focus of the willfulness inquiry under 11 U.S.C. § 523(a)(6) may be proven with circumstantial evidence.  *In re Thiara,* 285 B.R. at 432-433.  Circumstantial evidence of Lee's subjective knowledge that his conduct would cause distress is shown by his persistently asking Shim out for social outings and for a relationship beyond one for work when he knows that these are unwanted and unwelcome, frequently touching her person when he knows she did not like it and did not want him to and intentionally exposing himself to her at the workplace in an employer-employee relationship.

39. This analysis is consistent with the post-*Kawaauhau v. Geiger* case law holding that a debt based on a claim of sexual harassment is excepted from discharge as based on willful and malicious injury under 11 U.S.C. § 523(a)(6).  *In re Jones*, 300 B.R. at 139-141; *In re Spagnola*, 473 B.R. at 522-524; *In re Smith*, 270 B.R. at 549; *In re Kelly*, 238 B.R. at 160-161.

40. The court determines that Shim's actions, shown to constitute sexual harassment, were malicious because the actions were wrongful necessarily producing harm and without just cause or excuse.  As described above, Lee made sexual advances towards Shim, his employee, while at work, knowing that the advances were unwanted, and there was no justification or excuse for his actions when she said she did not want a personal relationship with him, she did not want to go out with him, she did not want him to touch her and she did not enjoy him touching her.

41. As discussed above, the court has determined that Shim has established that Lee is indebted to her based on her claims for sexual harassment and wrongful termination against him, and the court now determines that this debt is not excepted from discharge under 11 U.S.C. § 523(a)(6) because the preponderance of the evidence recited herein shows that the debt resulted from willful and malicious injury caused by Lee's wrongful acts.

42. The court makes no findings of fact and conclusions of law at this time as to the appropriateness of punitive damages or attorneys' fees, which must be sought by separate motion.

The court further orders counsel for Shim to submit a proposed judgment consistent with these findings of fact and conclusions of law within 30 days of the date of entry.

IT IS SO ORDERED.

### 

Date: March 19, 2015

Robert Kwan
United States Bankruptcy Judge